UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MYLES LEVIN, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) | No. _____ |
| | ) | |
| v. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| WALMART.COM USA LLC, WAL-MART STORES, INC. and NETFLIX, INC., | ) ) | JURY TRIAL DEMANDED |
| | ) | FILED: FEBRUARY 5, 2009 |
| | ) | 09CV744 |
| Defendants. | ) | JUDGE ANDERSEN |
| | | MAGISTRATE JUDGE DENLOW |

## COMPLAINT
PH

NOW COMES Plaintiff Myles Levin for Complaint brought under Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. §§ 15 & 29, for treble damages and injunctive relief against Defendants Netflix, Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Walmart.com USA LLC ("Walmart.com").   Based upon personal knowledge, information, and belief, and the investigation of counsel, Plaintiff alleges as follows:

### NATURE OF THE ACTION

1.      On or about May 19, 2005, Netflix, Wal-Mart Stores, and Walmart.com, a wholly owned subsidiary of Wal-Mart Stores, entered into an agreement to divide the markets for the sales and online rentals of DVDs in the United States ("Market Division Agreement"), with the purpose and effect of monopolizing and unreasonably restraining trade in at least the online DVD rental market.

2.      The meetings that led to the conspiracy began in January 2005, when Reed Hastings, the CEO of Netflix, and John Fleming, then the CEO of Walmart.com, met with each other for dinner to discuss the online DVD rental and DVD sales markets and how they could

reach an agreement that would reduce or eliminate competition in those markets. According to

Hastings, having "noticed how low Wal-Mart's prices [for DVDs] were," he "called the CEO [of

Walmart.com] in January and asked if he could have dinner." Fleming, who reported directly to

Wal-Mart Stores' CEO Lee Scott, accepted Hastings' invitation; the two thereafter met and

"started talking about how [they] could work together." As a result of the meetings and

exchanges that followed, Defendants entered into the contract, combination, and conspiracy

alleged herein. At the time of their initial meeting and prior to entering into the Market Division

Agreement, Netflix and Walmart.com were direct competitors in renting DVDs online and all

three defendants were potential competitors in selling new DVDs to consumers.  By no later

than May 19, 2005, however, Netflix, Wal-Mart Stores, and Walmart.com had entered into an

agreement by which Walmart.com would stop competing with Netflix in the online DVD rental

business and Netflix would promote the sales of new DVDs by Wal-Mart Stores and

Walmart.com, and not sell new DVDs in competition with them.

3.     Wal-Mart Stores actively participated in this conspiracy. This is confirmed by,

among other things, the fact that prior to the announcement of the Market Division Agreement,

John Fleming was promoted to Chief Marketing Office of Wal-Mart Stores. As of the time of

the announcement of the Market Division Agreement, Fleming thus was acting in his capacity

both as the Chief Marketing Officer of Wal-Mart Stores and the Wal-Mart Stores executive

responsible for overseeing the operations of Walmart.com. As Chief Marketing Officer of Wal-

Mart Stores, Fleming was responsible for deciding "what the largest, most powerful retailer in

history will stock on its shelves, and how much those products will cost. Such decisions, when

made at Wal-Mart, can help make or break entire industries."

4.      Defendants' conspiracy enabled Netflix to charge its customers higher subscription prices for the rental of DVDs than it otherwise would have. As a result of their contract, combination, and conspiracy as well as Netflix's unlawfully acquired and maintained market and monopoly power, Netflix actually did overcharge Plaintiff, and millions of other consumers similarly situated, and continues to do so.

5.      Under the Market Division Agreement, Netflix, Wal-Mart Stores, and Walmart.com agreed that they would restrain trade and eliminate competition. Wal-Mart Stores and Walmart.com agreed that Walmart.com would stop competing with Netflix in the online rental market. Netflix in turn agreed that it would not sell new DVDs, but instead would promote the DVD sales of Wal-Mart Stores and Walmart.com. In agreeing to promote the sale of DVDs by Wal-Mart Stores and Walmart.com, Netflix provided consideration for the agreement by Wal-Mart Stores and Walmart.com that Walmart.com would exit the online DVD rental market and simultaneously confirmed to Wal-Mart Stores and Walmart.com that Netflix would not enter the market to sell new DVDs, as Netflix was well-positioned and otherwise had the unilateral economic incentive to do. Since entering into the Market Division Agreement, neither Wal-Mart Stores nor Walmart.com have rented DVDs online and Netflix has not sold new DVDs. The Market Division Agreement served to entrench and enhance Defendants' dominant market positions and otherwise cause harm to competition, including enabling Netflix to charge higher subscription prices for online DVD rentals than it would have had they not entered into the agreement.  As Netflix's Hastings presciently remarked on May 19, 2005 -- the very day that the Market Division Agreement publicly was announced – "This agreement bolsters both Netflix's leadership in DVD movie rentals and Wal-Mart's strong movie sales

business." Plaintiff and all other similarly situated consumers in fact paid the higher subscription prices to Netflix.

6.      As alleged below, this case is brought as a class action on behalf of all consumers in the United States, who, during the period May 19, 2005, to the present (hereinafter, "Class Period"), paid a subscription fee to rent DVDs from Netflix. Plaintiff brings this action under Sections 4 and 16 of the Clayton Antitrust Act to seek redress in the form of treble damages and other relief for their injuries resulting from Defendants' violations of law on behalf of themselves and other similarly injured consumers nationwide and to seek a declaration that the Market Division Agreement is null and void.

## PLAINTIFF

7.      Myles Levin ("Levin") is an individual consumer who is a citizen of Illinois, and resides in the Northern District of Illinois.  During the Class Period, Levin directly subscribed to Netflix for his personal, non- commercial use. The subscription fees Levin paid to Netflix for renting DVDs were greater than he would have paid, but for the antitrust violations alleged herein.

## DEFENDANT NETFLIX

8.      Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los Gatos, California, 95032. Netflix is publicly traded on the NASDAQ under the symbol NFLX. Its revenues earned from engaging in interstate commerce exceed $1 billion annually. Through its website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by charging monthly subscription fees, which entitle customers to rent DVDs pursuant to various subscription plans. Netflix has possessed a market share of at least 75% of

the Online DVD Rental Market in the United States, as defined herein, at all times during the Class Period.

## DEFENDANT WAL-MART STORES

9.     Defendant Wal-Mart Stores is the largest retailer in the United States. Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville, Arkansas, 72716. Wal-Mart Stores is publicly traded on the New York Stock Exchange under the symbol WMT. Its revenues earned from engaging in interstate and foreign commerce approach $400 billion annually. Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells DVDs directly to consumers nationwide. Wal-Mart Stores sells far more DVDs than any other retailer in the United States, accounting for about 40% of all new DVDs sold to consumers domestically. Prior to the Market Division Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com competed with Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service, which was available on www.walmart.com.

## DEFENDANT WALMART.COM

10.     Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores. Walmart.com is a Delaware company with his headquarters at 7000 Marina Boulevard, Brisbane, California, 94005. It is the online component of Wal-Mart Stores' retail empire that is the leading seller of new DVDs in the United States. Prior to the conspiracy alleged herein, Walmart.com was also a major competitor of Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service, which was available on www.walmart.com.  While its financials are not publicly reported by Wal-Mart Stores, Walmart.com sells DVDs directly to consumers nationwide. Consumers who purchase DVDs via www.walmart.com may have them

either mailed or otherwise delivered to them directly, or may pick them up at a Wal-Mart Stores retail location via Walmart.com's and Wal-Mart Stores' "Site to Store" program.

11.    Walmart.com and Wal-Mart Stores are, in essence, completely integrated and operated as a single commercial enterprise and hold themselves out to the public as such, by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than being an independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is the registrant of www.walmartdvdrentals.com. Wal-Mart Stores' Chief Market Officer John Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-Mart Stores set up Walmart.com as a separate company with outside investors, but within six months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves as a 'marketing channel' for Wal-Mart Stores."

12.    Wal-Mart Stores was actively involved in the conspiracy alleged herein, as alleged more specifically below. For purposes of these allegations, both Wal-Mart Stores and Walmart.com are active participants in the conspiracy and each is liable for the unlawful conduct alleged herein, with each, among other things, participating in, and benefitting from, the Market Division Agreement. Moreover, Wal-Mart Stores directed, ratified, approved, supported, and otherwise aided and abetted Walmart.com's violations of law.

13.    Wal-Mart Stores had a strong incentive to accomplish the Market Division Agreement. In addition to the interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentive to enter into this Agreement, since it obtains substantial revenues from sales of new DVDs, as well as store traffic resulting in the sales of other goods, which would have been promotion of Wal-Mart Stores and Walmart.com through the Market Division

Agreement. In a letter submitted to this Court in connection with a prior antitrust case brought against Netflix by other plaintiffs for other alleged violations of law, an assistant general counsel of Wal-Mart Stores, referring specifically to Wal-Mart, wrote of "Wal-Mart's decision to discontinue renting DVDs." Moreover, it was Wal-Mart Stores that announced in part the Market Division Agreement, which identifies Wal-Mart Stores, in the "About" section of the press release. The announcement quoted John Fleming, who was then Chief Marketing Officer of Wal-Mart Stores, regarding the Agreement. It explained that Walmart.com's DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that, more generally, Wal-Mart Stores' "[olnline merchandise sales are available at www.walmart.com."

14.     Whenever reference is made in this Complaint to a statement or transaction of any corporation or entity, the allegation means that the corporation or entity acted by or through its directors, members, partners, officers, employees, affiliates, or agents, while engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within its scope of authority.

### JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1337 and 15 U.S.C. §§ 1-2, 15 & 26.

16.     Venue is proper in this District pursuant to 28 U.S.C.  §§ 15, 22 & 26 and pursuant to 28 U.S .C. § 1391 (b), (c) & (d), because at all times relevant to the Complaint (a) Defendants transacted business, were found, or acted through subsidiaries or agents present in this District; (b) a substantial part of Plaintiff's claims occurred in this District; and (c) a substantial portion of the affected trade and commerce described below has been carried out in this District.

17.     This Court has personal jurisdiction over Defendants because, *inter alia*, each of the Defendants has transacted business; maintained continuous and systemic contacts; purposefully availed itself of the benefits of doing business; and committed acts in furtherance of the alleged conspiracy in this State.

## INTERSTATE TRADE AND COMMERCE

18.     Defendants' conduct has taken place within the flow of, and substantially affected the interstate commerce of, the United States. By way of example, Defendants have sold and/or rented DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate commerce, and used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to sell and/or to rent DVDs throughout the United States.

## RELEVANT MARKET

19.     Defendants' market allocation conspiracy is *per se* illegal and requires no allegation of market definition.

20.     For those claims that may require market definition, the Relevant Market for purposes of these allegations during the Class Period at least is the Online DVD Rental Market in the United States.

21.     "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing commercially recorded entertainment programs for personal viewing. DVDs are the primary medium by which movies and other recorded entertainment are distributed in the United States. Revenues on DVDs far exceed those generated from box office receipts. In addition, DVDs have become a particularly lucrative means for the distribution of previously aired television programs, surpassing even television syndication rights as a revenue stream in

8

many instances. As defined herein, "DVD" does not refer to blank Digital Video Discs, which are used to store or record data.

22.    The relevant market is for the rental of DVDs online by subscription for delivery by mail ("Online DVD Rental Market"). At all relevant times, there have been no reasonably interchangeable substitutes for this service, which is differentiated, from both the demand and the supply side, from other methods of DVD distribution channels, as well as other methods of entertainment content delivery.

23.    In the Online DVD Rental Market, for a monthly subscription fee, a consumer may rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005) Walmart DVD Rentals. There are no late fees and no due dates, but, within any given plan, the consumer pays the subscription fee regardless of how many DVDs he or she rents per month. Thus, even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix CEO Reed Hastings calls this the "gym membership effect."

24.    To rent DVDs, consumers fill out a rental "queue" in their online profile, listing in order of preference the DVDs they wish to rent. The DVDs are then sent by the provider to the consumer's home via U.S. mail. To return the DVD and receive the next DVD in the queue, the consumer inserts the DVD in a prepaid envelope provided with the rental and mails it back; the service provider then mails the next movie on the list to the consumer. The library of titles available from online service providers has grown over time, now ranging near 100,000 -often 20 to 100 times the selection of titles stocked (not to mention available) at any single video rental store.

25.    From the consumer's perspective, online DVD rentals are a differentiated service that is not reasonably interchangeable with traditional bricks-and-mortar video rental. In

traditional video rental from physical stores, consumers drive to or otherwise arrive at the store, find (or do not find) what they are looking for, and pay on a per-DVD basis for their selection(s). After the designated rental period of one or more days, usually depending upon the release date of the DVD, the consumer returns his selection or potentially incurs late fees. During the Class Period as alleged herein, these late fees have accounted for as much as 20% of the revenues in traditional video rental stores; there are no late fees or due dates in the Online DVD Rental Market.

26.     There are numerous other practical indicia of the Online DVD Rental Market being a relevant product market, distinct from other forms of DVD rental, including:

a.     **Price Competition.** No direct price competition exists between online rental and other forms of DVD rental, whether in-store, kiosk, or video downloading, which are not reasonably interchangeable with online DVD rental. For example, online DVD rentals generally are priced on a monthly subscription basis. Within any given plan, the subscription rate is independent of the number of DVDs the customer actually rents in a month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay-per-view basis. Also, changes in the price of online rentals do not closely track changes in the price of in-store rentals. The pricing of online rentals is generally nationwide in scope and is not affected by local in-store prices and competition. As a result, the pricing of online rentals would generally be the same to a customer, regardless of whether the nearest rental store is two minutes or two hours away. Online rentals generally offer additional services, such as movie reviews, customer-specific recommendations based on viewing and preference history, and other metrics of popularity. The cross-elasticity of demand between these products is such that a small but significant non-transitory increase in price ("SSNIP") would not cause consumers to switch from online rental to in- store rental or any other arguable method of DVD distribution and vice versa.

b.     **Functional Differences.** Online rentals fundamentally differ from in-store rentals in that on-line rentals (1) do not require travel to a store (including a second trip to return the DVD and potentially multiple trips if the store does not have the DVD in stock at the right time), (2) are available to anyone with a postal address, regardless of proximity to a store, (3) are primarily subscription-based services, and (4) provide a much wider selection of titles than a brick-and-mortar store can and does. For these

reasons, among others, Online and in-store DVD rentals are not reasonably interchangeable. Likewise, other modes of content distribution, such as kiosk, video-on-demand, and downloading, among other forms, are not reasonably interchangeable with online DVD rentals for a number of reasons, including relative selection and convenience for consumers, pricing, as well as, from the supply perspective, licensing considerations and technological limitations.

c.   **Public and Industry Perceptions.** The online rental market is recognized as a distinct market by the public and the industry, including by Defendants.

d.   **Admissions.** By word and deed, Defendants have confirmed and recognized the existence of a discrete online rental market. Admissions of a discrete online rental market abound from Netflix and Walmart.com and Wal-Mart Stores executives alike, including Hastings and Fleming. Very recently, a Netflix executive told the Wall Street Journal that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix. That same executive acknowledged that while video downloads may be a competitive force in the future, DVD will be the dominant medium for years to come, making the entry of this technology not timely enough to be considered a competitive force in the relevant market. Netflix CEO Reed Hastings has observed that the competitive threat of internet downloading to online DVD rental during the Class Period is like that of hydrogen powered cars to gasoline powered card -inconsequential for many years to come. He has further explained that DVDs will be the dominant medium for movies for perhaps as long as the gasoline engine.

27.   Online DVD rentals are also a separate market from DVD sales. The pricing of DVD sales and online DVD rentals is very different. For example, the price to buy a new DVD depends heavily on how popular it is, including whether it is a new release or how successful the title originally was at the box office or on television. By contrast, online DVD renters generally charge based on a subscription fee, regardless of whether the consumer is renting popular or obscure DVDs. The industry and the public perceive online DVD rentals as separate from DVD sales, whether in-store or online. The factors motivating a consumer to buy a DVD are different from those that lead to renting a DVD. The former generally applies to DVDs that the consumer (or his family or friends) intends to view numerous times. The latter generally

applies to DVDs that the consumer intends to view once and then return. DVDs sold at retail have other distinguishing characteristics, such as packaging and special features not available with rentals, which are delivered unadorned in envelopes. In addition, the fact of whether a DVD is new or used is not an issue in rental, but is a significant factor in sales, for used DVDs are sold at a significant discount to their new counterparts, due to their being relatively less desirable to consumers. DVD sales and online rentals also are not reasonably interchangeable for consumers' intending to collect physical DVDs or to give a DVD as a gift. The cross-elasticity of demand between these products is such that a SSNIP would not cause consumers to switch from online renting to purchasing DVDs and vice versa.

28.     The Geographic Market for the Online DVD Rental Market is the United States. The practical reality is that, among other things, shipping costs and transglobal differences in DVD data encoding make it neither practical nor feasible for entities located in other countries to rent DVDs to U.S. consumers.

## MARKET AND MONOPOLY POWER

29.     At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix has an approximate market share of 75% in the online DVD Rental Market, and is far and away the market leader in the Online DVD Rental Market. As a result of this market share, Netflix has had and continues to have market and monopoly power in the Online DVD Rental Market; it has the power to control prices or exclude competition in this Relevant Market.

30.     Netflix's market and monopoly power is strengthened by the significant barriers to entry in this market. There have been no significant market entrants in the more than three years since announcement of the Market Division Agreement, which increased those barriers. Online requires the possession of a significant number of shipping facilities strategically located

12

throughout the United States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain the selection of titles that consumers demand. As Netflix CEO Reed Hastings has observed, "When you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large." Hastings further has noted that "opening a website that does rental is easy. What's hard is [creating] the scale to be able to do it profitably."

31.     Since the implementation of the Market Division Agreement, the Online DVD Rental Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not control. A few minor firms have shares of less than 1-2% of the market. During fiscal years 2005-2007 combined, Netflix earned nearly $4 billion in revenues and $1.4 billion in gross profit from renting DVDs to consumers -a margin of more than 33%. As a result of Netflix's abuse of its monopoly power alleged herein, its subscription fees have been higher than they otherwise would have been.

32.     Wal-Mart Stores and its wholly owned subsidiary Walmart.com combined have an industry-leading 40% of domestic DVD retail sales. During fiscal years 2005-2008 combined, they earned revenues in excess of $25 billion by selling DVDs to consumers. Both Wal-Mart Stores and Walmart.com benefit from the Market Division Agreement.

33.     Further evidence of Netflix's market and monopoly power is reflected in the anticompetitive effects alleged herein.

### THE ILLEGAL AGREEMENT

34.     **Pre-Agreement Competition in the Online DVD Rental Market.**  In early 2005, Netflix was coming off a year in which competition was growing and its stock price had

dropped precipitously. It faced increasing competition from Walmart DVD Rentals and from Blockbuster Online, the latter of which had just entered the online rental market. In fact, Wal-Mart's Fleming recognized that DVD "Rental was a good business." The increased competition from Wal-Mart, however, was not good news for Netflix. "Since its core business is online DVD rentals, Netflix might have been the company most threatened by Wal-Mart's push into the sector," as one industry publication then noted. That publication further noted, "Because of its size, buying power and agreements with movie distributors, Wal-Mart could have put significant pricing pressure on Netflix over time, analysts said."

35.     By mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan. Blockbuster entered the online market in earnest in August, at first charging $19.99 but then reducing its price in November to $17.49 for its similar plan. After that, the Walmart DVD Rentals rate was reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced its prices by nearly 20% (to $17.99 per month) soon thereafter. After that, Blockbuster further decreased its price to $14.99 -20% below Netflix's already reduced price and more than 40% below the price Netflix was charging just months earlier.

36.     Meanwhile, Wal-Mart Stores and its wholly owned subsidiary Walmart.com, which had established themselves as a the leader in new DVD sales, were facing increasing competition from in-store and online channels of distribution in new DVD sales, including competition from Amazon.com. At the time, Netflix was a significant potential additional competitor, since it had a subscriber base of millions of customers who were known in the industry to be prolific DVD buyers, and the sales and profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain significant additional sales and profits and to

gain further market share in the sale of new DVDs if these customers were to make their purchases of new DVDs from them instead.

37.     **The Walmart Price Cut.**  On January 7, 2005, Walmart DVD Rentals dropped the price on its most popular DVD rental plan significantly -to $12.97 per month -creating further price pressure on Netflix to reduce its DVD rental prices. Even Netflix's Hastings admitted at the time that Walmart's DVD rental "prices are so much better than anywhere else on the Internet" and that this price difference was "huge." This growing price disparity plainly was not good news for Netflix, even though it was for consumers. In order to respond to the increased competition, Netflix therefore would have been forced to lower its prices and thereby reduce its profits.

38.     **The January Dinner Meeting.**  Faced with this increasing competition, Reed Hastings, the Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com, and invited him to dinner to discuss their companies' DVD sales and rentals businesses. Fleming accepted the invitation.  The two met in January 2005 and, according to Hastings, "started talking about how [they] could work together." They proceeded to embark upon a scheme that would result in the contract, combination, conspiracy, and agreement reflected in the Market Division Agreement.

39.     **Hastings' Subsequent "Prediction."**  On May 5, 2005, in Netflix's First Quarter earnings call with financial analysts, held after the January dinner but only two weeks prior to the public announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

> In terms of profitability over the coming years, the key issues is the number of major competitors. If there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets. If,

on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in online rental, then profits would likely be small.

Hastings went on to "predict" on the conference call:

The likely case is [that] online rental becomes a two-firm market over the coming years.

40.     **The Public Announcement.** On May 19, 2005, shortly after Fleming had been promoted to Chief Market Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed the existence of the Market Division Agreement, by which they unlawfully divided and allocated the markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings sought. Recognizing the tremendous benefits that this improper agreement would bring to Defendants, if not consumers or competition, Hastings stated that "This agreement bolsters both Netflix's leadership in DVD movie rentals and Wal-Mart's strong movie sales business."

41.     **The Media's Reaction.** The news of the agreement was featured in a number of newspapers and other publications in articles with aptly colorful titles, such as:

    a.      "Wal-Mart and Netflix Scratch Each Other's Backs,"

    b.      "Truce in DVD-Rental Wars,"

    c.      "Netflix:  An Alliance," and

    d.      "Vice-Versa."

42.     **The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the online rental business. Walmart.com announced to all of the subscribers to "Walmart DVD Rentals'" that it was exiting the online DVD rental business and that those subscribers could be transferred to Netflix. Walmart.com took additional steps to affirmatively implement the Market Division Agreement by adding a prominently placed link to the Netflix website to

encourage customers to transfer their subscriptions to Netflix. Walmart customers transferring their subscriptions to Netflix would, for the first year, continue to pay $12.97 for two movies per month or $17.36 for three movies per month. Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its existing online rental business), neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

43.     As a result of the Market Division Agreement, downward pricing pressure from Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors. Absent the Market Division Agreement, Netflix would have lowered its prices no later than May 19, 2005. As a result of the elimination of a competitor in this Relevant Market, Blockbuster was able to raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per month, in accord with Hastings' expectation that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets." In Netflix's next earnings call, on August 8, 2005, Hastings boasted:

> Last quarter we said online rental was shaping up to be a two-player market, and that is indeed what is happening.

44.     The Market Division Agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have wanted Walmart.com to withdraw from the online rental market, encourage its subscribers to be transferred to Netflix, and promote Netflix's rental business absent substantial consideration from Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market Division Agreement, Walmart.com would not have exited the Online DVD Rental Market when it did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of subscribers -a base of customers who purchase on average 25 DVDs per year each -and

17

would not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own sales, absent an agreement from them not to compete against Netflix's online rental business.

## ANTICOMPETITIVE EFFECTS

45.     Defendants' illegal acts and practices have caused anticompetitive effects in the Online DVD Rental Market. The subscription fees charged by Netflix to Plaintiff, as well as the other members of the Class, were maintained at artificially high and supracompetitive levels. Plaintiff and the other members of the Class paid higher subscription prices to Netflix than they otherwise would have paid.

46.     The Market Division Agreement (i) eliminated one of only three significant competitors in the Relevant Market, (ii) eliminated competition between Defendants, and (iii) enabled Netflix to acquire market power and also acquire and maintain monopoly power in the Relevant Market. The Market Division Agreement has enabled Netflix to implement monopolistic and supracompetitive pricing in the Relevant Market. Indeed, once news of the Market Division Agreement broke, one business publication proclaimed that "that's one less competitor for the DVD rental pioneer" and that "Now it looks like the competitive storm [with respect to online DVD rentals] is dying down."

47.     The Market Division Agreement and Defendants' acts and practices in furtherance thereof have no procompetitive benefits. They do not create information that consumers need, nor do they create new or better products or services. Rather, they have served to reinforce the true anticompetitive nature of the Market Division Agreement by assuring, for example, that Walmart.com not only withdrew from the Online DVD Rental Market, but further enhanced Netflix's position in that market. Even if there were any such benefits, they would not outweigh

any of the anticompetitive effects described herein, and, in any event, could be achieved by less restrictive means.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action on his own behalf and as a class action under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the Class, as defined herein.

49.     Plaintiff brings this action on behalf of himself and the members of the Class, defined as comprising:

> Any person in the United States that paid a subscription fee to Netflix to rent DVDs, on or after May 19, 2005 up to the present. Excluded from the Class are government entities, Defendants, their co-conspirators and their representatives, parents, subsidiaries, and affiliates.

50.     The Class numbers in the millions, the exact number and identities of the members being known by Defendants.

51.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

52.     There are questions of law and fact common to the Class and the members thereof. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof. The questions include, but are not limited to:

a.     Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

b.     Whether Defendants unreasonably restrained trade in the Online DVD Rental Market;

c.     Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

d.  The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e.  Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f.  Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

g.  The anticompetitive effects of Defendants' violations of law;

h.  Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole; and

i.  Whether the conduct of Defendants, as alleged in this Complaint, caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the business and property of Plaintiff and other members of the Class.

53. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including the legal and factual issues relating to liability and damages.

54. Plaintiff is a member of the Class.  His claims are typical of the claims of other members of the Class, and he will fairly and adequately protect the interests of the members of the Class.  His interests are aligned with, and not antagonistic to, those of the other members of the Class.

55. Plaintiff is represented by competent counsel experienced in class action antitrust litigation.

56. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class treatment will permit the adjudication of relatively small claims by members of the Class who otherwise could not afford to litigate antitrust claims such

as are asserted in this Complaint. This class action presents no difficulties of management that would preclude its maintenance as a class action.

<strong>ANTITRUST INJURY AND STANDING</strong>

57.      During the Class Period, Plaintiff and the members of the Class have directly paid monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

58.      Plaintiff and the members of the Class have suffered, and many continue to suffer, injury of the type that the antitrust laws are designed to punish and prevent. Plaintiff and the members of the Class have paid, and many continue to pay, more to subscribe to Netflix than they would have, absent the Market Division Agreement. As a direct and proximate result of the unreasonable restraint of trade and market and monopoly power created by the Market Division Agreement, Plaintiff and the members of the Class were, and many continue to be, injured and financially damaged in their businesses and property, in amounts that are not presently determined. As the direct victim of Defendants' antitrust violations, Plaintiff and the Class are the most efficient enforcers of the antitrust claims made herein.

<strong>COUNT ONE<br>SHERMAN ACT SECTION ONE (15 U.S.C. § 1)<br>Illegal Market Division (Against All Defendants)</strong>

59.      Plaintiff realleges each allegation set forth above, as if fully set forth herein.

60.      Defendants have entered into a per se illegal market division agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Even if evaluated under the Rule of Reason, the Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

61.      Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. In addition, Netflix, on the one hand, and Wal-

21

Mart Stores and Walmart.com, on the other hand, were potential competitors in new DVD sales. Wal-Mart Stores and Walmart.com were actual participants and Netflix was a potential participant, with the means and economic incentive to sell new DVDs -in the absence of the Market Division Agreement.

62.     Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market Division Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and Walmart.com agreeing not to compete in that Relevant Market. The agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs in competition with them. In addition to explicitly or de facto agreeing not to sell new DVDs, Netflix also obtained the Market Division Agreement by providing potentially valuable promotion to Wal-Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and that Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

63.     The Market Division Agreement has created significant anticompetitive effects and no procompetitive benefits. It eliminated competition in the Relevant Market, raising prices paid by consumers. To the extent that there are any procompetitive benefits at all resulting from the agreement, they would not outweigh the agreement's anticompetitive effects. In any event, to the extent that there were any, they could have been achieved by less restrictive means.

64.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

**COUNT TWO**
**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Monopolization of Online DVD Rental Market (Against Netflix)**

65.     Plaintiff realleges each allegation set forth above, as if fully set forth herein.

66.     Netflix has monopoly power in the Online DVD Rental Market.

67.     Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

68.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

**COUNT THREE**
**SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Attempt to Monopolize Online DVD Rental Market (Against Netflix)**

69.     Plaintiff realleges each allegation set forth, as if fully set forth herein.

70.     If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

71.     With the specific intent to achieve a monopoly, Netflix, by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

72.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been higher than they otherwise would have been.

## COUNT FOUR
## SHERMAN ACT SECTION TWO (15 U.S.C. § 2)
### Conspiracy to Monopolize Online DVD Rental Market (Against All Defendants)

73.     Plaintiff realleges each allegation set forth above, as if fully set forth herein.

74.     Defendants shared a conscious commitment to a common scheme designed to achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Relevant Market by Netflix. Defendants have committed overt acts in furtherance of their conspiracy, including entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

75.     As a result of this violation of law, Netflix's subscription prices charged to, and paid by, Plaintiff and the Class are, and have been higher than they otherwise would have been.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that:

a.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative, and that Plaintiff's counsel be appointed as counsel for the Class.

b.     Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1-2.

c.     The Court declare the Market Division Agreement between Defendants announced May 19, 2005, to be unlawful and null and void.

d.      Judgment be entered for Plaintiff and the members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate.

e.      Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy having similar purposes or effect and from adopting or following any practice, plan, program or device having a similar purpose or effect, pursuant to Section 15 of the Clayton Antitrust Act of 1914, 15 U.S.C.§ 29.

f.      Plaintiff and the members of the class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all issues triable by jury.

Respectfully Submitted,


s/ John R. Wylie
Counsel for Plaintiff


Date:  February 5, 2009

John R. Wylie
Stewart M. Weltman
FUTTERMAN HOWARD WATKINS
   WYLIE & ASHLEY, CHTD.
122 S. Michigan Ave.
Suite 1850
Chicago, IL  60603
(312) 427-3600


[G:\DA\Netflix\Pleading\Complaint.doc]